# Supreme Court of Florida

No. SC2023-0058

**TIMOTHY W. FLETCHER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 17, 2025
<u>CORRECTED OPINION</u>

FRANCIS, J.

Appellant, Timothy W. Fletcher, appeals his sentence of death[1]

imposed after his *Hurst*[2] resentencing.  We affirm.

## I. Background

Fletcher was convicted and sentenced to death in 2012 for the

first-degree murder of Helen Googe in 2009.  *Fletcher v. State,* 168

---

1.  We have jurisdiction.  Art. V, § 3(b)(1), Fla. Const.

2.  *See Hurst v. State,* 202 So. 3d 40 (Fla. 2016) (interpreting
*Hurst v. Florida,* 577 U.S. 92 (2016), as requiring a unanimous jury
recommendation for death), *receded from in part by State v. Poole,*
297 So. 3d 487 (Fla. 2020).

So. 3d 186 (Fla. 2015). As we detailed in *Fletcher*, Fletcher confessed that he and his cellmate, Doni Ray Brown, escaped from the Putnam County Jail with a plan to acquire money from Googe, Fletcher's grandfather's ex-wife, whom Fletcher believed kept a large sum in a safe at her home. When interviewed by detectives, Fletcher changed his story several times, claiming he played only a passive role in the murder and that Brown killed Googe. When detectives confronted Fletcher with the fact that he had visible scratches and injuries on his arms and Brown had none, and with the fact that they could test for DNA under Googe's fingernails, Fletcher changed his story, admitting he had a much more active role but maintaining that Brown killed Googe.

Fletcher's story was that after escaping jail and stealing a vehicle, he and Brown made their way to Googe's home, entered at night while she slept, and retrieved one of his grandfather's revolvers. They then entered Googe's bedroom, startled her awake, and tied her hands with a phone cord. Googe screamed but was reassured she would be okay if she followed their instructions.

Brown and Fletcher then questioned Googe about her money. Googe was uncooperative, denied having a safe, denied having a

credit card, and said she only had $37 in her purse. When Googe attempted to escape, Fletcher said that Brown physically pinned her down on the bed, and Fletcher threatened her with a gun, telling her to stop kicking her legs.

Googe finally went with Fletcher and Brown to the safe but attempted to escape again to the bathroom and hit Brown with a hairdryer. According to Fletcher, Brown retaliated by pinning her down on her bed and putting a pillow over her face. Googe continued fighting back.

Fletcher intervened and took them back to the safe. He recounted that Googe's hands were "visibly shaking" as she tried to open it. Because there was no money, and Googe continued to deny she had any, Fletcher said Brown made two attempts to kill Googe while she was in the fetal position on the floor—one by strangulation and one by breaking her neck.

After those attempts failed, Fletcher and Brown physically carried Googe by her head and feet to her den. She fought back, kicking out at Brown, who had one of her legs, and scratching Fletcher, who had her head. Fletcher called her a bitch and dropped her. When she tried to get up,

Fletcher admitted to becoming violent, striking her "in the head three times—once on the cheek and twice high on the side of her head—with an open hand." *Id.* at 196. During his post-arrest statement, Fletcher explained he struck her because "she was being ignorant" and "wanted to fight." *Id.* "All she had to do was just be quiet and give up the $37 and . . . say what the PIN number is to her credit card and she would have just got tied up and left." *Id.*

After striking Googe, Fletcher claimed Brown got on top of her again and choked her with both hands while Fletcher held her legs down. Though she stopped moving, she made "snoring noises." *Id.* According to Fletcher, Brown placed a plastic bag over Googe's head and tied a phone cord around it, at her neck. Fletcher said "[t]he bag became foggy." *Id.* He claimed he left the room and when he returned a few minutes later, Brown told him that Googe was dead.

Afterward, Brown and Fletcher took Googe's car and fled to the home of Brown's aunt. Brown's aunt later testified that Brown had no scratches or physical injuries to his arms.

The physical evidence presented at Fletcher's 2012 trial generally corroborated his version of events leading up to the cause of death. However, the medical examiner determined Googe's death was caused by manual forced strangulation, noting she had bruising under her chin consistent with someone's thumbs squeezing down on her neck and that her larynx was fractured. Also, the DNA under Googe's fingernails belonged to Fletcher, who had scratches on his arms.

The jury unanimously found Fletcher guilty and recommended death by a vote of eight to four. We affirmed on direct appeal in *Fletcher*.

### New Penalty Phase

Because the jury's penalty phase recommendation was not unanimous, Fletcher successfully moved for postconviction relief in 2016 under *Hurst*, and the trial court granted a new penalty phase and resentencing. Before the new penalty phase, Fletcher filed several relevant motions in limine, the first two of which were granted: (1) a motion to limit victim impact evidence, which was partly granted and limited the State to three statements; and (2) a motion to preclude improper closing argument that denigrates or

converts mitigation into aggravation based on the same prosecutor's prior statements during Fletcher's guilt and first penalty phases. *See Fletcher*, 168 So. 3d at 209-16. Fletcher's other motions, to (3) declare each of the four aggravating factors in his case unconstitutional both facially and as applied, and (4) give a special jury instruction on mercy, were denied.

At his new penalty phase, the State sought to prove four statutory aggravators: (1) the murder was committed while the defendant was under sentence for a prior felony conviction; (2) the murder was committed while the defendant engaged in the commission or attempted commission of a robbery; (3) the murder was committed for pecuniary gain; and (4) the murder was especially heinous, atrocious, or cruel (HAC). *See* § 921.141(6)(a), (d), (f), (h), Fla. Stat. (2022). In support of these aggravators, the State presented much of the same evidence presented at Fletcher's 2012 trial through eight witnesses, as recounted in *Fletcher*. The evidence included publication of Fletcher's lengthy partial confession; testimony about the DNA evidence linking him to Googe's body; the judgment and sentence for Fletcher's previous burglary convictions; and, over Fletcher's renewed objection, three

- 6 -

victim impact statements from the original trial, given by: (1) Debra Black, the victim's daughter; (2) Kristofer Key, the victim's nephew; and (3) Randall Key, the victim's brother. The State then rested.

Fletcher sought to establish forty-nine mitigating circumstances, including four statutory mitigators, through four witnesses: (1) Dr. Daniel Buffington, a pharmacologist and toxicologist; (2) Dr. Jennifer Rohrer, a forensic psychologist; (3) Jeffrey Fletcher, Fletcher's younger brother; and (4) Roy Lee Walker Jr., Fletcher's best friend.[3] All four witnesses testified to Fletcher's

---

3. These mitigators were that Fletcher: (1) entered a plea to first-degree murder, along with codefendant Brown (uncontested, great weight); (2) was under the influence of extreme mental or emotional disturbance at the time of the murder, *see* § 921.141(7)(b) (not proven); (3) had substantially impaired capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, *see* § 921.141(7)(f) (not proven); (4) had a young age at the time of the murder, *see* § 921.141(7)(g) (undisputed, was 25 at time of murder, slight weight); (5) & (6) suffered extreme emotional and physical abandonment (respectively) (proven on both, slight weight); (7) was unable to form lasting, safe relationships (uncontested, slight weight); (8) was terrified of his abusive father (same); (9) had no role models during his early childhood development (proven, slight weight); (10) was not protected by his mother (same); (11) & (12) had alcoholic parents (mother and father, respectively) (same); (13-15) was diagnosed with mental health disorder (ADHD), alcohol dependence, and substance use disorder involving cocaine, methamphetamines, and opiates (respectively) (uncontested, slight weight on each); (16) has post-traumatic stress disorder (PTSD) (not proven); (17) & (18),

- 7 -

(20) & (21) experienced extreme environmental trauma—homelessness, domestic instability, witnessed his father physically abuse his mother, and witnessed his parents use alcohol in excess (respectively) (uncontested or proven, slight weight on each); (19) experienced extreme domestic violence as a child (uncontested, slight weight); (22) was encouraged by maternal grandfather to steal for him (same); (23) received no medical attention for years of abuse (same); (24) never received emotional support for years of trauma (same); (25) never received mental health counseling for years of abandonment (same); (26) attempted to self-medicate and cure himself with alcohol (proven, slight weight); (27) made several suicide attempts (proven as to one attempt, no weight); (28) was always treated as an outsider (reasonably inferred from other evidence but no weight); (29) & (30) has low self-esteem and no self-confidence (respectively) (proven, slight weight); (31) experienced long-term emotional trauma from his childhood (proven but no independent evidentiary value, no weight); (32) suffered from depression for many years before being diagnosed (proven, slight weight); (33) was never treated for PTSD (unproven); (34) has a biological father who may suffer from mental illness (no direct evidence but given slight weight); (35) has no well-defined social skills (proven, slight weight); (36)-(38) is a product of his environment and has always been at risk for failure to achieve, was failed by his parents at a young age, and failed by a system that should have protected him from his abusive and impoverished environmental conditions (considered together, uncontested, slight weight); (39) suffers from anxiety and inability to control stressors (proven, slight weight); (40) was conceived out of wedlock (same); (41) was bullied unmercifully by his father (proven but no weight); (42) has impaired problem-solving skills (not proven); (43) has adaptive deficits (proven, no weight); (44) is diagnosed with bi-polar disorder (proven, no weight because already accounted for impulsivity); (45) was the victim of sexual abuse (proven, no weight); (46) has learning disabilities (uncontroverted, no weight in light of escape plan); (47) & (48) had been consuming methamphetamine up to the time of his escape and the homicide and was consequently sleep-deprived (respectively) (not proven); and (49) any other circumstances in his character, background, and life that

- 8 -

difficult, abusive, and impoverished childhood during which he witnessed domestic violence and alcoholism; experienced parental abandonment, neglect, and mistreatment; and was encouraged by his grandfather to steal for him. Fletcher tried alcohol when he was six, marijuana when he was eleven, and cocaine in his teens. He was ultimately diagnosed with attention deficit hyperactivity disorder (ADHD), alcohol dependence, and substance use disorder involving cocaine, methamphetamine ("meth"), and opiates.

Dr. Buffington and Dr. Rohrer also opined that Fletcher was under the influence of extreme mental or emotional disturbance at the time of the murder, a statutory mitigator under section 921.141(7)(b), due to his reported use of meth during the four days leading up to his escape. Dr. Buffington explained that meth makes people feel strong and powerful but impairs judgment; causes confusion, impulsivity, and hyperexcitability; and keeps them awake.

However, on cross, both experts agreed Fletcher's meth use was based on self-reporting. Brown also told police they had not

---

mitigate against imposing the death penalty, *see* § 921.141(7)(h) (moderate weight overall).

been using drugs prior to the escape, and no drug paraphernalia was found in their shared cell. Further, the State's forensic toxicologist, Dr. Bruce Goldberger, testified that meth is very impairing, and, had Fletcher been using it, it would have affected his ability to do complex tasks, like escape from jail, conceal the escape, steal a car, and find Googe's house. The State's other expert, Dr. Gregory Prichard, a forensic psychologist who interviewed Fletcher before his first trial in 2012, and before his new penalty phase in 2022, agreed that Fletcher's planning and procuring the tools needed for the escape were inconsistent with meth impairment.

As to Fletcher's mental health history, both his experts testified that, based off Fletcher's records, he had a history of suicidal ideations. Dr. Rohrer noted he made two suicide attempts in his teens. However, the State's witness, Dr. Prichard, testified that this did not match what they knew of Fletcher, who previously reported that he never tried to kill himself.

Fletcher's experts also testified that Fletcher had been diagnosed with several mental health conditions, including bipolar disorder, depressive disorder, and ADHD. While in jail, Fletcher

- 10 -

was additionally diagnosed with anxiety, insomnia, and antisocial personality disorder.

Given Fletcher's bipolar diagnosis in particular, Dr. Rohrer opined that Fletcher had a substantially impaired capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law, a statutory mitigator under section 921.141(7)(f). She also evaluated Fletcher for PTSD and found his results were consistent with PTSD in childhood.

However, on cross, Dr. Rohrer agreed that some of Fletcher's bipolar symptoms could be explained by other disorders and agreed that the mania associated with the disorder was not present in any of Fletcher's records. She also agreed that Fletcher did not avoid triggering traumas, a symptom required for a PTSD diagnosis.

The State's witness, Dr. Prichard, also opined that Fletcher's crimes contradicted the avoidance symptom for PTSD, and the indication of childhood PTSD in Fletcher's records was based on his own self-reporting in 2008. He agreed there was no evidence of

mania in Fletcher's records but there was depression and polysubstance abuse.[4]

Additionally, defense counsel asked Dr. Rohrer about Fletcher's antisocial personality disorder diagnosis, which the State's expert, Dr. Prichard, agreed with and opined was probably his primary diagnosis. She explained that it is a "characterological" personality disorder, not a mental illness, that is marked by poor impulse control and a "persistent disregard for the rights of others" that is largely based on criminal behavior and "disregarding the law, evidenced by repeated arrests." On cross, she agreed that another marker of antisocial personality disorder is deceitfulness.

The State's witness, Dr. Prichard, similarly testified that antisocial personality disorder is something different from an "organic mental illness" like bipolar disorder. He agreed it is "characterological" and explained that the "benchmark issue with antisocial personality people is that they don't conform their

---

4. As for Fletcher's other diagnoses in his record, Dr. Prichard explained to the jury that in a correctional setting, when a doctor prescribes a drug to treat a symptom that is being reported, the doctor must notate any mental health diagnoses reported by the patient/inmate, whether the patient meets the criteria or not.

- 12 -

behavior to requirements of the law, so they get arrested a lot. . . . [I]t's also known as the criminal personality." He also agreed that persons with this condition are usually deceitful.

During closing, the prosecutor commented on the evidence that Fletcher had antisocial personality disorder, asking rhetorically what was mitigating about having that disorder.[5] This drew an objection from the defense, which the trial court anticipated given its pretrial order. Later, out of the jury's hearing, the trial court denied Fletcher's motion for mistrial but offered to give a curative instruction. Defense counsel did not object.

Ultimately, the jury unanimously found the existence of all four aggravating factors beyond a reasonable doubt, found the

---

5. In context, the following exchange occurred:

PROSECUTOR: What antisocial personality is, it's a character trait. It's characterological. And what that means is, is that there's a history with Timothy Fletcher of breaking the law, of violating the rights of others. Another characteristic is deceitfulness.
So in what way is that mitigating? It's not. It's not mitigating. It just tells us about his character. There's nothing organic in terms of his --
DEFENSE: Judge, may we approach?
THE COURT: No. Sustained. The jury will disregard the last argument, that is, it being argued as a mitigating circumstance.

aggravators were not outweighed by the mitigators, and unanimously recommended death. However, based on the wording of the question concerning whether any mitigators had been proven by the greater weight of the evidence, the jury marked "no":

**C.    Mitigating Circumstances:**

One or more individual jurors find that one or more mitigating circumstances was established by the greater weight of the evidence.

YES _____    NO _____

**Please proceed to Section D, regardless of your findings in Section C.**

The jury was polled and agreed that this was its verdict.

After the jury was dismissed, the trial court expressed concern over the answer to the mitigation interrogatory given the amount of uncontested mitigation evidence presented and requested briefing before the *Spencer*[6] hearing.

### New *Spencer* Hearing

At the *Spencer* hearing held on November 22, 2022, Fletcher presented evidence of two other mitigating circumstances. First, Aubrey Land, a retired law enforcement correctional professional

---

6.  *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 14 -

and now consultant, testified that if given a life sentence, Fletcher could adjust well and be well-suited to teaching and tutoring other inmates who want to earn a GED or similar degrees.  Second, Fletcher made an unsworn statement expressing remorse to the victim's family.  Additionally, the trial court sua sponte considered the evidence of Fletcher's antisocial personality disorder as mitigation.  The trial court afforded each of these mitigators slight weight in the sentencing order.

## New Sentencing Hearing

Fletcher's sentencing hearing was held on January 3, 2023, and the judge issued his order that same day.  The court found the existence of all four aggravating factors but merged two, for a final finding of three aggravating factors that were each assigned great weight: (1) prior felony conviction and under sentence of imprisonment; (2) murder committed for pecuniary gain (committed during the commission of a robbery); and (3) HAC.

The court considered fifty-two mitigating factors and found seven were not supported by the evidence, including the two contested statutory mitigators.  The court gave great weight to one statutory mitigator—that codefendant Brown was sentenced to

life—and slight or no weight to other individual mitigators. Cumulatively, Fletcher's mitigation was given moderate weight.

The trial court was concerned over the jury's recommendation due to its finding of "no" mitigation and "seriously considered" what weight to assign it. Ultimately, he followed the recommendation and sentenced Fletcher to death.

## Claims on Appeal

Fletcher appeals, raising nine issues. Six of Fletcher's claims are preserved: (1) whether the prosecutor's statements during the penalty phase closing argument improperly denigrated and converted Fletcher's antisocial personality disorder diagnosis into aggravation; (2) whether the jury engaged in "reverse jury nullification" by finding on the verdict form that "no" mitigation was found to exist; (3) whether the lower court abused its discretion by denying Fletcher's request for a special mercy instruction; (4) whether victim impact evidence should be permitted during the penalty phase; (5) whether this Court should recede from *Lawrence*[7] and reinstate proportionality review; and (6) whether Florida's

---

7. *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020).

capital sentencing scheme and the aggravators applied in Fletcher's case are unconstitutional both facially and as applied.[8] Fletcher also raises two unpreserved claims as fundamental error: (7) whether placing the burden of proof on the defendant to establish mitigators at the penalty phase violates the Eighth Amendment; and (8) whether the sentencing court's failure to give the *Enmund/Tison*[9] instruction to the jury and make a specifically labeled *Enmund/Tison* finding in the sentencing order requires reversal. Finally, (9) Fletcher claims that the cumulative effect of these alleged individual errors requires reversal for a new penalty phase.[10] As explained below, we conclude that Fletcher is not entitled to relief and affirm.

---

8. Fletcher also raises a subclaim that the cold, calculated, premeditated aggravator (CCP) is unconstitutional. To the extent it is part of his facial challenge overall, it is properly raised. But any as-applied challenge to the CCP aggravator is improper because it was not an aggravator in Fletcher's case.

9. *Enmund v. Florida*, 458 U.S. 782 (1982); *Tison v. Arizona*, 481 U.S. 137 (1987).

10. Fletcher was appointed substitute appellate counsel after all briefing concluded, and substitute counsel moved to file an amended initial brief and restart all briefing. The State objected, and that objection was sustained.

## II.  Discussion

At the outset, because we conclude that Fletcher is entitled to no relief on any of his individual claims, we deny claim (9), his cumulative error claim, without further discussion.  Additionally, because this Court has repeatedly rejected claims (3) (special mercy instruction)[11] and (5) (reinstatement of proportionality review),[12] we deny these claims without further discussion.

### A. Fletcher's Preserved Claims

### *Denigration of Antisocial Personality Disorder (claim 1)*

First, Fletcher generally challenges the prosecutor's comment during closing argument asking the jury a rhetorical question as to how Fletcher's antisocial personality disorder could be mitigating.

---

11.  Fletcher's jury was given Standard Jury Instruction 7.11, which "[w]e have repeatedly determined . . . adequately informs jurors of the applicable legal standard."  *Bevel v. State*, 376 So. 3d 587, 597 (Fla. 2023), *cert. denied,* 144 S. Ct. 2570 (2024); *see also Woodbury v. State*, 320 So. 3d 631, 656 (Fla. 2021) (rejecting special instruction on mercy because "Standard Jury Instruction 7.11 is not ambiguous when it comes to addressing the jurors' options" to show mercy and impose a life sentence instead of a death sentence).

12.  We have repeatedly declined the invitation to recede from *Lawrence* and reinstate automatic appellate proportionality review. *See, e.g., Cruz v. State*, 320 So. 3d 695, 723 (Fla. 2021).

He argues that this comment was an improper attempt to convert mitigating evidence into aggravating evidence in violation of the trial court's order on Fletcher's pretrial motion in limine.[13]  However, the trial court sustained Fletcher's objection to this comment during the penalty phase and gave a curative instruction.  Thus, on appeal, instead of raising a claim of trial court error, Fletcher focuses on censuring the prosecutor for failing to abide by the pretrial order prohibiting such arguments to the jury after allegedly doing so in *Fletcher*.[14]

---

13.  Even though Fletcher's antisocial personality disorder was not introduced as a mitigator, aspects of that diagnosis—such as Fletcher's lack of impulse control—were meant as mitigation.

14.  In *Fletcher*, however, Fletcher's claim that the prosecutor's penalty phase comments denigrated his mitigation evidence was not aimed at any comment about his antisocial personality disorder. Instead, Fletcher claimed the comments were aimed at Fletcher's proposed mitigators, such as his addiction to drugs, history of depression, witnessing his mother being physically abused, and artistic ability, all upon which the prosecutor commented that a lot of people have these things but "do not murder other people."  168 So. 3d at 214-16.  This Court rejected Fletcher's claims, finding the prosecutor "did not contend that the mitigating circumstances presented were invalid or excuses," nor did the prosecutor "characterize the mitigation evidence in a negative way."  *Id.* at 215. The issues with Fletcher's antisocial personality disorder diagnosis came out, instead, during the testimonies of the experts—Dr. Prichard for the State and Dr. Krop for the defense.  Both discussed the "psychopathy" checklist in testifying how they diagnosed

- 19 -

Because Fletcher's argument was sustained and the trial court gave a curative instruction, Fletcher must demonstrate the trial court abused its discretion in denying his motion for mistrial. But Fletcher's brief on this point does not even reference the decision on the motion for mistrial, let alone explain how the trial court's decision constituted an abuse of discretion. As a result, this claim is inadequately briefed and cannot form the basis for relief. *See Cole v. State*, 392 So. 3d 1054, 1063 n.14 (Fla. 2024).

To the extent Fletcher challenges the ruling on his motion for a mistrial, a decision on a motion for mistrial "is within the sound discretion of the trial court and should be granted only when

_____

Fletcher with antisocial personality disorder, and, given that context, this Court rejected Fletcher's claim that the State elicited testimony of "future dangerousness" based on Dr. Prichard's description of antisocial personality disorder as a "chronic disorder." *Id.* at 210. This Court also held that Fletcher opened the door to Dr. Prichard's testimony about his prior criminal record. *Id.* at 210-11. However, though ultimately finding it to be harmless, this Court found the trial court erred by permitting the State, over Fletcher's objection, to elicit testimony from Dr. Prichard that Fletcher lacked remorse, which is one of the features of antisocial personality disorder. *Id.* at 211-13. In any event, based on the prosecutor's remarks at the original penalty phase, Fletcher filed a "Motion in Limine to Preclude Improper Closing Argument." The motion was granted in an order stating in relevant part: "There should be no denigration of the Defendant's case."

necessary to ensure that the defendant receives a fair trial." *See Chamberlain v. State*, 881 So. 2d 1087, 1098 (Fla. 2004) (citing *Rivera v. State*, 859 So. 2d 495, 512 (Fla. 2003)).  "[W]hen an improper comment is made, objected to by counsel, and sustained by the trial court and corrected by the issuance of a curative instruction, this Court has held that the proper standard of review governing the denial of a motion for a mistrial is abuse of discretion." *Andres v. State*, 254 So. 3d 283, 299 (Fla. 2018) (citing *Chamberlain*, 881 So. 2d at 1098).

Here, though, it appears the prosecutor's comment was not improper.  While "a prosecutor may not improperly denigrate or attempt to invalidate mitigation evidence" by describing it in negative terms, a prosecutor has wide latitude in closing and may properly attempt to "persuade the jury that the proffered mitigation was not mitigating in nature, or should be given only little weight." *See Fletcher*, 168 So. 3d at 214-15 (citing and distinguishing *Delhall v. State*, 95 So. 3d 134, 167-68 (Fla. 2012), and *Brooks v. State*, 762 So. 2d 879, 903 (Fla. 2000)).  Here, it appears the prosecutor's comment was aimed at persuading the jury that antisocial personality disorder is not mitigating in nature.  Thus, based on

- 21 -

this record, we conclude the prosecutor's comment did not denigrate his antisocial personality disorder and turn it into aggravation.

In addition, Fletcher's counsel immediately objected, and the trial judge sustained the objection and instructed the jury to disregard the comment. A short time later, the judge offered a curative instruction, to which Fletcher's counsel made no objection. The lower court also reminded the jury before deliberations that what the attorneys say is not evidence. Further, the lower court ultimately found that Fletcher's antisocial personality disorder was mitigating and even gave it slight weight in the sentencing order.

Thus, even if the comment was improper, the trial court did not abuse its discretion in denying Fletcher's motion for mistrial. We therefore deny relief on this claim.

### *Jury's Verdict on Mitigation (claim 2)*

Fletcher asserts a new penalty phase is required because the jury's verdict form shows it ignored uncontroverted mitigation

evidence, thereby engaging in "reverse jury nullification"[15] in violation of the Eighth Amendment. We disagree.

First, the jury's verdict on mitigation does not violate the Eighth Amendment because—as construed by the U.S. Supreme Court—the Eighth Amendment does not require *any* jury recommendation as to whether to impose life or death. *See Poole*, 297 So. 3d at 505; *Spaziano v. Florida*, 468 U.S. 447, 464-65 (1984).[16] Instead, Fletcher has a statutory right under section 921.141(2)(b) to have a jury find the existence of mitigating

---

15. Because jury nullification generally means the jury ignored the evidence of guilt and showed mercy instead by acquitting a defendant, reverse jury nullification means the jury ignored mitigating circumstances when recommending imposition of the death penalty. A similar claim was raised in *Mosley v. State*, 397 So. 3d 1001, 1005 (Fla. 2024), but was found to be procedurally barred.

16. "The text of our constitution requires us to construe the state cruel and unusual punishment provision in conformity with decisions of the Supreme Court interpreting the Eighth Amendment." *Poole*, 297 So. 3d at 505. "Binding Supreme Court precedent in *Spaziano* holds that the Eighth Amendment does not require a jury's favorable recommendation before a death penalty can be imposed." *Id.* (citing *Spaziano*, 468 U.S. at 464-65). "Therefore, the same is true of article I, section 17 [of the Florida Constitution]." *Id.*

circumstances, weigh them against any aggravating factors, and make a recommendation as to life or death.

Second, Fletcher has not shown the jury failed to follow the law or instructions on the statutory weighing process and recommendation. In Florida, litigants and the public are prohibited from "invading the privacy of the jury room." *Baptist Hosp. of Mia., Inc. v. Maler*, 579 So. 2d 97, 99 (Fla. 1991) (quoting *Velsor v. Allstate Ins. Co.*, 329 So. 2d 391, 393 (Fla. 2d DCA 1976)). Thus, "in the absence of evidence to the contrary, we presume that jurors follow the trial court's instructions." *Lowe v. State*, 259 So. 3d 23, 52 (Fla. 2018) (citing *Hurst*, 202 So. 3d at 63).

In an attempt to establish his claim of reverse jury nullification, Fletcher cites an unpublished opinion of the Tenth Circuit Court of Appeals, *United States v. James*, that sets out the role of a juror in the Sixth Amendment context. 203 F.3d 836 (10th Cir. 2000) (table), 2000 WL 136816, at *2-4 (Feb. 7, 2000). The issue in *James* was whether it was plain error for the trial court to sua sponte dismiss a juror who stated during voir dire that he might *not* follow the law or instructions. The Tenth Circuit found no error, reasoning that "[a] person who is either unwilling or

unable to follow the court's instructions is not qualified to be a juror." *Id.* at *4. The Tenth Circuit further reasoned that "[a] defendant's right to an impartial jury does not include a right to a jury composed of persons who will disregard the district court's instructions. '[T]here is no right to jury nullification.'" *Id.* at *3-4 (second alteration in original) (quoting *Crease v. McKune,* 189 F.3d 1188, 1194 (10th Cir. 1999)).

While *James* is generally instructive on the role of individual jurors and jury nullification, Fletcher's case is distinguishable. Unlike the juror in *James* who expressly stated during voir dire that he might not follow the law and instructions, the jurors at Fletcher's new penalty phase agreed to follow the law and instructions and made no indication to the contrary on the face of the record. Though Fletcher points to the verdict form as evidence of nullification, the jury form is not conclusive proof that any of the jurors failed to follow instructions.

Of course, based on this verdict form, the lower court found the jury's answer as to whether any mitigation evidence was proven was against the weight of the evidence. *See Coday v. State,* 946 So. 2d 988, 1001 (Fla. 2006) ("[T]he trial court must find as a mitigating

circumstance any proposed factor that is both reasonably established by the greater weight of the evidence and mitigating in nature."). But the lower court's finding does not automatically mean the jury failed to follow the law or instructions, especially because the jury here was *not* instructed during the penalty phase that it must deem any unrebutted mitigation evidence proven and, if so, check "yes" on the verdict form. Thus, notwithstanding the "no" verdict, Fletcher cannot rebut the presumption that the jury followed the law as it was instructed here.[17]

_____

17. Given the amount of unrebutted mitigation, the lower court was concerned with the verdict form and thoughtfully considered whether the interrogatory was mere surplusage under section 921.141(2)(b), Florida Statutes (2022), which requires the jury to make a recommendation based upon its weighing of any unanimously found aggravating factors (making the defendant death eligible) and whether those aggravators "outweigh the mitigating circumstances found to exist." § 921.141(2)(b)2.a.-c., Fla. Stat. (2022). Though the verdict form conforms to the statute's language concerning the mitigators "found to exist" by the jury and is not mere surplusage in that sense, the lower court is correct that the statute does not expressly require a written finding by the jury as to the mitigators found to exist. This interrogatory was amended in 2023, and the standard verdict form now asks jurors to attest that they "considered whether one or more mitigating circumstances exist." *See* Fla. Std. Jury Instr. (Crim.) 3.12(e) (2025).

- 26 -

Additionally, the verdict is not contrary to the other jury instructions given in a capital penalty phase. The jurors were told to individually consider and weigh mitigation evidence, and that they do not have to render a unanimous verdict on mitigation. Given these instructions, it is far more likely the jury was unsure how to follow these instructions and answer the verdict form interrogatory collectively at the same time. Thus, the verdict form alone does not overcome the presumption that the jury followed, or attempted to follow, instructions as given in this case.

Ultimately, the lower court properly overrode the jury's "no" interrogatory, finding the existence of the vast majority of Fletcher's forty-nine mitigators—most of which were unrebutted or affirmatively proven. The court then weighed the mitigators found to exist, affording great weight to one "statutory" mitigator (the codefendant's life sentence) and moderate weight to mitigation overall in the sentencing order.[18] Further, the lower court found

---

18. The sentencing court mistakenly described this as a statutory mitigator in the sentencing order. It may be treated as a mitigating factor, however, under the catchall provision of section 921.141(7)(h).

three additional mitigators after the *Spencer* hearing that it afforded slight weight. The lower court agreed with the jury's unanimous finding of four aggravators—two of which it merged for a total of three aggravators, including the weighty HAC aggravator—and afforded them great weight. And despite the verdict form interrogatory on mitigation, the lower court agreed with the jury's recommendation for death because the aggravation unanimously found by the jury outweighed the established mitigators.

In sum, Fletcher has failed to establish "reverse jury nullification" by rebutting the presumption that the jury followed or attempted to follow the instructions as given to it. Further, the lower court cured any irregularity in the verdict form, independently finding and weighing Fletcher's proven and unrebutted mitigators. Thus, Fletcher is entitled to no relief on this claim.

### *Victim Impact Evidence (claim 4)*

Fletcher asserts that victim impact statements should be wholly inadmissible during the penalty phase of a capital murder proceeding because the only relevant evidence to the defendant and his sentence is the State's evidence of statutory aggravating factors under section 921.141(6). Fletcher asserts that because victim

impact statements can be inflammatory and take the jury's focus off the defendant and sentence, they should be deemed per se inadmissible and unconstitutional under the Eighth and Fourteenth Amendments.  To that end, he urges this Court to recede from following *Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (holding that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar"), and *Windom v. State*, 656 So. 2d 432 (Fla. 1995) (following *Payne*), and return to following *Booth v. Maryland*, 482 U.S. 496, 503 (1987) (holding that victim impact evidence is "irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner"), which was overruled by *Payne*.[19]

---

19.  501 U.S. at 825 ("We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. . . .  By turning the victim into a 'faceless stranger at the penalty phase of a capital trial,' *Booth* deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." (citation omitted)).

We decline Fletcher's invitation. This Court rejected a similar claim in *Fletcher* and has repeatedly recognized that victim impact evidence is admissible at the penalty phase. *See Fletcher*, 168 So. 3d at 220 (rejecting a constitutional challenge to victim impact statements raised as a "subclaim" under challenge to Florida's capital sentencing scheme); *see also Kalisz v. State*, 124 So. 3d 185, 211 (Fla. 2013) (explaining that victim impact evidence is admissible during the penalty phase under section 921.141, Florida Statutes, and article I, section 16 of the Florida Constitution).

Further, this Court has no authority to categorically ban the admission of victim impact evidence from capital penalty phase proceedings. First, in Eighth Amendment cases, "[t]he text of [Florida's] constitution requires us to construe the state cruel and unusual punishment provision in conformity with decisions of the Supreme Court interpreting the Eighth Amendment." *Poole*, 297 So. 3d at 505. Thus, this Court has no authority to recede from following the Supreme Court's construction of the Eighth Amendment in *Payne*, which holds that the Eighth Amendment "erects no *per se* bar" to victim impact evidence. 501 U.S. at 827.

Second, "the Florida Constitution in Article I, Section 16, and

the Florida Legislature in section 921.141([8]), Florida Statutes [ ],

instruct that in our state, victim impact evidence is to be heard in

considering capital felony sentences." *Windom*, 656 So. 2d at 438.

In other words, "[t]he admission of victim impact evidence is

protected by article I, section 16 . . . and is . . . specifically

governed by section 921.141([8])." *Kalisz,* 124 So. 3d at 211.[20]

Thus, we are constitutionally prohibited from granting Fletcher's

requested relief, to categorically ban victim impact evidence in

capital penalty phase proceedings.

Further, as to the specific statements admitted in this case,

Fletcher makes only a conclusory assertion that reading the victim

impact statements at his penalty phase tainted the jury, but he

points to nothing specific within these three statements that would

demonstrate any taint. Thus, he has not carried his burden of

---

20. *See* art. I, § 16(b)(6)d., Fla. Const. (2018) ("A victim shall have the following specific rights upon request: The right to provide information regarding the impact of the offender's conduct on the victim and the victim's family to the individual responsible for conducting any presentence investigation or compiling any presentence investigation report, and to have any such information considered in any sentencing recommendations submitted to the court.").

demonstrating error on this claim. *See, e.g.*, *Deparvine v. State*, 995 So. 2d 351, 378 (Fla. 2008) ("Initially, we reject this claim because Deparvine does not specify what part of the testimony was repetitive and therefore fails to sufficiently identify the error."). And in any event, the three victim impact statements are well within the confines of what is permitted by section 921.141(8).[21] None of the statements characterize or opine upon "the crime, the defendant, [or] the appropriate sentence." *Id.* Thus, Fletcher is not entitled to any relief on this claim.

### *Constitutionality of Florida's Capital Sentencing Scheme (claim 6)*

As he did in his original appeal in 2015, Fletcher generally challenges Florida's death sentencing scheme under section 921.141 as unconstitutional, raising both facial and as-applied challenges. Apart from his arguments on "aggravator drift" (i.e., the

___

21. § 921.141(8), Fla. Stat. (providing that once aggravators are presented, the prosecution may present victim impact evidence demonstrating "the victim's uniqueness as an individual human being and the resultant loss to the community's members by the victim's death" and that "[c]haracterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as a part of victim impact evidence").

overprovision of statutory aggravators), however, Fletcher never specifically raised below two of the arguments now raised here—that the abandonment of both proportionality review and the circumstantial evidence rule has rendered the entire statute unconstitutional.  Additionally, Fletcher did not directly challenge the constitutionality of the cold, calculated, premeditated (CCP) aggravator below.

To the extent these are facial challenges, Fletcher may raise them for the first time on appeal.[22]  But, we find no merit in them.

First, we recognized in *Lawrence* that proportionality review is not required by the Eighth Amendment.  308 So. 3d at 548. Further, the remedy to the historic concern about arbitrariness is *individualized* sentencing.[23]  Thus, there is no merit to the

---

22.  Though these facial challenges were not raised below, this Court has stated that "[t]he facial validity of a statute, including an assertion that the statute is infirm because of overbreadth, can be raised for the first time on appeal even though prudence dictates that it be presented at the trial court level to assure that it will not be considered waived." *Trushin v. State*, 425 So. 2d 1126, 1129 (Fla. 1982).  "The constitutional application of a statute to a particular set of facts is another matter and must be raised at the trial level." *Id.* at 1129-30.

23.  *See generally Enmund*, 458 U.S. at 798 ("The question before us is not the disproportionality of death as a penalty for

suggestion that the lack of proportionality review renders the entire capital sentencing scheme in Florida facially unconstitutional for failing to narrow the class of death-eligible defendants. *See Wells v. State*, 364 So. 3d 1005, 1015 (Fla. 2023) ("We have repeatedly rejected the argument that the death-penalty statute violates the Eighth Amendment because it fails to sufficiently narrow the class of murderers eligible for the death penalty.").

Second, the now-abrogated circumstantial evidence rule[24] was applied at the *guilt* phase in determining the sufficiency of the State's evidence in circumstantial evidence cases, *not* to the penalty and sentencing phases.[25] Further, the rule was previously applied

---

murder, but rather the validity of capital punishment for Enmund's own conduct. The focus must be on *his* culpability, not on that of those who committed the robbery and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' which means that we must focus on 'relevant facets of the character and record of the individual offender.'" (citations omitted)).

24. *See Bush v. State*, 295 So. 3d 179, 200 (Fla. 2016) (eliminating the circumstantial evidence rule).

25. *Knight v. State*, 186 So. 3d 1005, 1010 (Fla. 2016) ("Courts should ask whether the evidence of that particular defendant's guilt is entirely circumstantial, not whether all of the State's evidence of the crime is circumstantial." (emphasis omitted)).

- 34 -

to *all* criminal circumstantial evidence cases, not just capital cases.[26] Thus, the circumstantial evidence rule was not designed to help narrow the class of *death*-eligible defendants, and its abrogation is of no value in a facial challenge to Florida's capital sentencing scheme. *See Loyd v. State*, 379 So. 3d 1080, 1098 (Fla. 2023) (rejecting argument that "the elimination of the special standard of review previously used in cases involving wholly circumstantial evidence" contributes to rendering the death penalty statute unconstitutional and explaining that the circumstantial evidence rule was abrogated, in part, because it is confusing (citing *Bush*, 295 So. 3d at 200)).

Third, Fletcher's facial challenge to the CCP aggravator (which is not an aggravator in Fletcher's case) has previously been rejected by this Court.[27]

---

26. *See, e.g.*, *Knight v. State*, 107 So. 3d 449 (Fla. 5th DCA 2013) (explaining that this Court (previously) mandated that "Florida's appellate courts use a 'special standard of review of the sufficiency of the evidence . . . where a conviction is wholly based on circumstantial evidence' " (citation omitted)), *approved*, 186 So. 3d 1005.

27. *See Lynch v. State*, 841 So. 2d 362, 374 (Fla. 2003) ("Finally, defendant's claim that Florida's death penalty scheme is unconstitutional because the CCP aggravating factor is applied in

Next, we consider Fletcher's facial and as-applied challenges to the constitutionality of each of the four aggravators proven in his case, challenges he raised in motions in limine below, and to the statute's so-called "aggravator drift." We conclude the lower court committed no error in rejecting these challenges.

First, Fletcher asserts that the "committed while under sentence for a prior felony conviction" aggravator is unconstitutional on its face and as applied because it is vague and overbroad and, thus, has been applied in an arbitrary manner. This claim is meritless because this aggravator clearly applies here, where Fletcher escaped jail just before committing this murder. And when a provision may be applied constitutionally in some circumstances, it is not facially unconstitutional. *See Gainesville Woman Care, LLC v. State*, 210 So. 3d 1243, 1271 (Fla. 2017) (Canady, J., dissenting) (describing the "no-set-of-circumstances" test applicable to facial constitutional challenges), *receded from by Planned Parenthood of Sw. & Cent. Fla. v. State*, 384 So. 3d 67 (Fla.

---

an arbitrary and capricious manner is without merit. This Court has upheld the CCP aggravating factor as constitutional." (citing *Fotopoulos v. State*, 608 So. 2d 784, 794 (Fla. 1992))).

2024).

Second, Fletcher's facial and as-applied constitutional challenges to the "pecuniary gain" aggravator are meritless. Fletcher asserts this aggravator is unconstitutional because of the risk of doubling and repeating the same aspects of the underlying felony, a robbery, for purposes of the felony murder aggravator. But no doubling with the underlying robbery occurred here because the lower court merged it with the pecuniary gain aggravator. *See Francis v. State*, 808 So. 2d 110, 136 (Fla. 2001) (finding no improper doubling where the sentencing court merged the pecuniary gain aggravator with during the course of a felony aggravator based on a robbery).

Third, Fletcher's facial and as-applied challenges to the so-called felony murder aggravator on the basis that it is overbroad and, essentially, automatic, are meritless. This Court has rejected similar if not identical arguments.[28] Further, Fletcher's as-applied

---

28. *See Miller v. State*, 926 So. 2d 1243, 1260 (Fla. 2006) (rejecting the argument that "Florida's capital felony sentencing statute is unconstitutional because every person who is convicted of first-degree felony murder automatically qualifies for the aggravating circumstance of commission during the course of an enumerated felony"); *Ault v. State*, 866 So. 2d 674, 686 (Fla. 2003)

challenge is moot given that this aggravator was merged with the pecuniary gain aggravator by the lower court.

Fourth, this Court has consistently rejected Fletcher's argument that the HAC aggravating circumstance is unconstitutionally vague and overbroad.[29]  Further, HAC was constitutional as applied here given the evidence of the torture and prolonged strangulation of a scared, elderly, conscious victim in her own home.  *See Barnhill v. State*, 834 So. 2d 836, 850 (Fla. 2002) ("Because strangulation of a conscious victim involves foreknowledge and the extreme anxiety of impending death, death by strangulation constitutes prima facie evidence of HAC.").

---

(rejecting the argument that the murder in the course of a felony aggravator is unconstitutional because it constitutes an automatic aggravator and does not narrow class of death-eligible persons).

29.  *See Dillbeck v. State*, 357 So. 3d 94, 104-05 (Fla. 2023) (explaining that "the Court has consistently rejected as 'without merit' challenges that the HAC aggravator is 'overbroad, vague, and fail[s] to narrow the class of persons eligible for the death penalty' " (quoting *Card v. State*, 803 So. 2d 613, 628 (Fla. 2001)); *Cruz*, 320 So. 3d at 731 ("declin[ing] to revisit" precedent "rejecting as meritless the argument that the jury instruction on HAC is unconstitutionally vague" (citing *Gilliam v. State*, 582 So. 2d 610, 612 (Fla. 1991))).

Finally, we have consistently rejected Fletcher's challenge to the death penalty statute's so-called "overprovision" of aggravators (which Fletcher labels "aggravator drift"). *See Bevel*, 376 So. 3d at 597 (rejecting claim that Florida's capital sentencing scheme is unconstitutional because the number of aggravating factors does not sufficiently narrow the class of individuals who are eligible to receive the death penalty (citing *Colley v. State*, 310 So. 3d 2, 15-16 (Fla. 2020))); *see also Wells*, 364 So. 3d at 1015 (finding no constitutional defect with Florida's death penalty statute based on the number of aggravating factors).

Accordingly, we deny relief on Fletcher's facial and as-applied constitutional challenges to Florida's death penalty scheme.

## B. Fletcher's Claims of Fundamental Error

Conceding he launched no contemporaneous objection below, Fletcher's next two claims assert that the sentencing court fundamentally erred by instructing the penalty phase jury that the defendant had to prove mitigation by a preponderance of the evidence (claim 7), and by omitting the *Enmund/Tison* jury instruction and specifically labeled finding in the sentencing order (claim 8).

To establish fundamental error concerning unobjected-to and thus unpreserved penalty phase jury instructions on appeal, the "alleged error must reach down into the validity of the sentencing proceeding itself such that the sentence could not have been obtained without the assistance of the alleged error." *Smiley v. State*, 295 So. 3d 156, 174 (Fla. 2020) (citing *Archer v. State*, 673 So. 2d 17, 20 (Fla. 1996)). This Court has also defined it as "error which goes to the foundation of the case." *Farina v. State*, 937 So. 2d 612, 629 (Fla. 2006) (quoting *Ray v. State*, 403 So. 2d 956, 960 (Fla. 1981)).

### *Instruction on Burden of Proving Mitigation (claim 7)*

Fletcher asserts that the sentencing court fundamentally erred by instructing the jury that the defendant must establish mitigators by a preponderance of the evidence at the penalty phase because placing *any* burden of proof on the defendant is neither authorized by section 921.141 nor the Eighth Amendment. To that end, Fletcher urges this Court to recede from its decision in *Campbell v. State*, 571 So. 2d 415, 419 (Fla. 1990), *receded from on other grounds in Trease v. State*, 768 So. 2d 1050 (Fla. 2000), where this Court held that "[t]he [sentencing] court must find as a mitigating

circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence." Fletcher argues that *Campbell* read additional requirements into the law of mitigation without statutory authority from section 921.141 and was referring to standards that applied to a judge's findings, not a jury's findings.

Fletcher's claim is patently meritless. Generally, a "burden of proof" is procedural, not substantive, meaning it falls within the province of the judiciary and its rule-making authority. While the Legislature has the authority to adopt procedural provisions in statutes that are "intertwined with substantive rights," *see Caple v. Tuttle's Design–Build, Inc.*, 753 So. 2d 49, 54 (Fla. 2000), this Court always has the authority to adopt rules of practice and procedure under article V, section 2(a) of the Florida Constitution, *cf. Love v. State*, 247 So. 3d 609, 610-12 (Fla. 3d DCA 2018) (concluding that statute setting burden of proof did not violate the separation of powers doctrine by invading the province of the judiciary because it was substantive enough, and noting in a parenthetical that this Court has "consistently rejected constitutional challenges [to statutes] where the procedural provisions were intertwined with

substantive rights" (citing *Caple*, 753 So. 2d at 54)), *decision quashed on other grounds*, 286 So. 3d 177 (Fla. 2019).

Further, this Court recently rejected a similar but *preserved* claim in *Loyd*, 379 So. 3d 1080. In *Loyd*, this Court addressed "whether the trial court erred in reading the standard jury instruction because in Loyd's view it does not comport with section 921.141(2)(b), Florida Statutes (2021)." *Id.* at 1092. This Court rejected Loyd's argument, explaining that it is a firmly established principle in Florida law that a mitigating circumstance that must be "found to exist" under section 921.141(2)(b)2.b. is one "established by the greater weight of the evidence." *Id.* (quoting *Bright v. State*, 299 So. 3d 985, 1000 (Fla. 2020)).

And setting a burden of proof to establish mitigation in a capital case does not run afoul of the Eighth Amendment. *See Walton v. Arizona*, 497 U.S. 639, 649-50 (1990) (rejecting the contention that Arizona's capital sentencing statute violated the Eighth and Fourteenth Amendments because it imposed on defendants the burden of showing by a preponderance of the evidence that there were mitigating circumstances sufficiently

substantial to call for leniency), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

To the extent Fletcher claims that the standard instruction on mitigation is fundamental error because it shifts the burden to the defendant, this claim is also meritless. *See Bush*, 295 So. 3d at 210 (explaining that the "standard penalty phase jury instructions do not 'impermissibly shift the burden to the defense to prove that death is not the appropriate sentence' " (quoting *Rogers v. State*, 957 So. 2d 538, 555 (Fla. 2007))).

In sum, because Fletcher's arguments are meritless, he cannot establish any error, much less fundamental error. Thus, the Court denies relief on this claim.

### *Lack of* Enmund/Tison *Instruction (claim 8)*

Fletcher claims the trial court fundamentally erred by failing to give an *Enmund/Tison*[30] instruction to the jury and by failing to make an *Enmund/Tison* finding in the sentencing order. He concedes that he did not object to the omission of the instruction to the jury.

---

30. *Enmund*, 458 U.S. 782; *Tison*, 481 U.S. 137.

- 43 -

*Enmund* and *Tison* require that, under the Eighth

Amendment's prohibition against cruel and unusual punishment,

each codefendant in a felony murder case must be sentenced

proportionally to their individual culpability.  As this Court

explained in *Smiley*, *Enmund* and *Tison* stand "for the proposition

that 'the death penalty may be proportional punishment if the

evidence shows both that the defendant was a major participant in

the crime, and that the defendant's state of mind amounted to

reckless indifference to human life.' "  295 So. 3d at 175 (quoting

*Jackson v. State*, 575 So. 2d 181, 191 (Fla. 1991)).

We recently rejected a fundamental error claim based on the

omission of the *Enmund*/*Tison* instruction in *Cruz*, 320 So. 3d 695.

In *Cruz*, this Court held that the omission of the *Enmund*/*Tison*

instruction was not fundamental error because the record showed

Cruz was a "major" participant in the felony committed and had a

"reckless indifference to human life."  *Id.* at 723 (first quoting *Tison*,

481 U.S. at 158; and then citing *Jackson v. State*, 502 So. 2d 409,

412 (Fla. 1986)); *see also Jackson*, 502 So. 2d at 412 ("[B]y being a

major participant in the armed robbery, [the defendant], at the very

least, contemplated that life would be taken.").  Here, although not

specifically labeled an *Enmund/Tison* finding, the lower court

expressly found that the evidence pointed to Fletcher as the person

who actually strangled Googe, that he was a major participant, and

that his participation was more significant than Brown's because he

was the mastermind.

Fletcher seeks to distinguish *Cruz* because, during the guilt

phase in that case, the jury answered special interrogatories on the

verdict form and found that Cruz actually possessed a firearm. 320

So. 3d at 708.[31] However, special interrogatory verdict forms are

not required for the *Enmund/Tison* instruction during the penalty

phase. *Jackson*, 502 So. 2d at 413 ("No special interrogatory jury

forms are required.").[32] Further, Fletcher's penalty phase jury was

instructed to consider Brown's life sentence as a "statutory"

---

31. We ultimately concluded that the jury's special finding that Cruz actually possessed a firearm was not supported by competent, substantial evidence. *Id.* at 716-17.

32. Fletcher suggests such findings are necessary to increase the penalty under *Ring*, 536 U.S. 584. But *Ring* imposes requirements to protect a defendant's right to have the jury find any factor that exposes him to greater sentencing liability under the Sixth Amendment, whereas the *Enmund/Tison* requirements protect the defendant's Eighth Amendment right to individualized sentencing based on the defendant's individual culpability. Thus, there is no *Ring* issue here.

mitigator and was even given his negotiated plea agreement to review. Thus, the jury was given the opportunity to recommend that the lower court sentence Fletcher to life as well. The lower court also gave Brown's life sentence great weight as a "statutory" mitigator but ultimately found that the evidence pointed to Fletcher as the person who actually murdered Googe. This conclusion is supported by the evidence presented by the State.

Based on this record, Fletcher has failed to demonstrate that his death sentence could not have been obtained without the assistance of the omission of an *Enmund/Tison* instruction. Thus, he is entitled to no relief.

### III. Conclusion

Because we find no reversible error in Fletcher's second penalty phase and resentencing proceedings, we affirm his death sentence.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., concurring in result.

While I agree with the decision to affirm Fletcher's conviction for first-degree murder, I concur in result as to the Court's opinion.

Although the majority has rejected this Court's decades-long practice of conducting comparative proportionality review in cases involving the direct appeal of a sentence of death, I continue to adhere to the views expressed in my dissenting opinion in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020).

Moreover, in this appeal of Fletcher's death sentence, I agree that the sweeping elimination of the circumstantial evidence rule in criminal cases does not support his challenge to the constitutionality of Florida's death penalty. *See Bush v. State*, 295 So. 3d 179 (Fla. 2020) (eliminating heightened standard of review of convictions based solely on circumstantial evidence). Nonetheless, I reaffirm my dissent in *Bush*, wherein I lamented the "abandon[ment of] the reasonable safeguard provided by the heightened sufficiency of the evidence standard." *Id.* at 217 (Labarga, J., concurring in part and dissenting in part).

An Appeal from the Circuit Court in and for Putnam County,
    Howard O. McGillin, Jr., Judge
    Case No. 542009CF000648CFAXMX

Matthew J. Metz, Public Defender, and Nancy Ryan, Assistant
Public Defender, Seventh Judicial Circuit of Florida, Daytona
Beach, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Naomi
Nichols, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee